UNITED STATES of America,
Plaintiff–Appellee,

v.

William KIMMONS, Howard Small,
Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Bruce Lee BERTA, Defendant–
Appellant.

Nos. 90–5413, 90–5432.

United States Court of Appeals,
Eleventh Circuit.

July 8, 1992.

Theodore J. Sakowitz, Federal Public Defender, Gregory A. Prebish, Alison Marie Igoe, Asst. Federal Public Defenders, Miami, Fla., for Small.

Kenneth P. Speiller, Miami, Fla., for Kimmons.

Dexter W. Lehtinen, U.S. Atty., Frank H. Tamen, Lynne W. Lamprecht, Linda C. Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Henry M. Bugay, Miami, Fla., for Berta.

Before FAY, Circuit Judge, DYER and CLARK *, Senior Circuit Judges.

FAY, Circuit Judge:

In this consolidated appeal, William Kimmons, Howard Small, and Bruce Lee Berta challenge the district court's application of the United States Sentencing Guidelines. In addition, Small and Kimmons raise claims concerning the validity of their convictions. The appellants were charged with conspiracy to affect commerce by robbery of armored car companies, in violation of 18 U.S.C. § 1951(a), and with related firearms offenses. A jury convicted Kimmons and Small on all counts, and each received life imprisonment with additional concurrent sentences. In a separate proceeding, Berta pled guilty to all pertinent counts of the indictment and received a sentence of 123 months. We AFFIRM the challenged convictions and the sentences the district court imposed on each defendant.

## I. BACKGROUND

On June 21, 1989, an anonymous source notified the Federal Bureau of Investigation (FBI) that certain unidentified individuals intended to rob an armored car near Bird Road in the southwest section of Miami. The robbery would be committed by men driving a white van with a boomerang-shaped television antenna on the roof. In response to the tip, the FBI established a loose surveillance of several financial institutions in the area. The FBI ascertained the routes and delivery stops of armored cars in the vicinity and watched for unusual activity.

The next day, a white van, precisely matching the description provided by the anonymous source, deliberately drove through the parking lot of the Coral Gables Federal Savings & Loan on Bird Road moments after a Wells Fargo armored car had arrived to deliver cash to the bank. The van was registered to William Kimmons. Having been warned by the FBI of the threat, Wells Fargo had conspicuously placed extra guards with shotguns on their armored cars. The white van turned away.

In mid afternoon, the van again drove through the parking lot of the bank. It then circled around the block of a second branch bank of Coral Gables Federal Savings & Loan. In the late afternoon, the FBI spotted the van at the Town & Country Mall, where Special Agent Robert Kaminski observed Kimmons and Howard Small exit the van, Kimmons enter the mall, and Small stand in the parking lot of the CenTrust branch bank for roughly ten minutes.

The following day, on June 23, 1989, Special Agent Peter Schopperle observed Small sitting at the entrance of the Las Americas shopping center on Coral Way. Small stayed at the mall for approximately five hours, intermittently surveying the traffic that entered the stores, making calls from a pay phone, walking to a turnpike overpass that overlooked the mall, and watching the arrivals of a Wells Fargo armored car at a Woolworth's Department Store and a Brinks armored car at Ocean Bank and Flagler Bank mall branches.

Over the next five weeks, the FBI observed the defendants repeatedly return to the Las Americas mall. On June 26th, Kimmons and Small arrived at the mall shortly before a Wells Fargo armored car delivered cash to a Woolworth's store; they watched the delivery from the sidewalk of the mall, standing at opposite sides of the armored car. On July 3rd, Small and Kimmons again arrived at the mall, approximately one minute prior to the arrival of a Wells Fargo armored car. They watched the armored car's activities at the

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

mall and left approximately fifteen minutes after the car departed. On at least ten more occasions the defendants arrived at the mall solely for the purpose of observing armored cars, police patrols, mall traffic, the parking lot, and potential escape routes.

The FBI tracked the defendants to a single story residence at 12350 S.W. 35th Street in Miami. Kimmons had rented the residence continuously since 1987. Bruce Lee Berta, who had joined Kimmons and Small in their activities at the mall, had subleased a room from Kimmons and lived at the residence with his girlfriend. In June and July of 1989, during the course of their joint activity, Small also used the house as his residence.

On July 31, 1989, the FBI observed the defendants prepare for the actual robbery. The defendants had parked a Lincoln Town car in front of a Zayre store next to the door through which a Loomis armored car messenger entered and left with cash. At 8:50 a.m., Berta and Small drove a stolen Dodge Aspen from Kimmons' residence to the mall, and Kimmons followed in a Cadillac owned by Berta. Once at the mall, Small entered the Lincoln and drove it out while Berta pulled the Dodge into the same space. Kimmons remained in his Cadillac and drove up and down the parking lanes in front of Zayre's before returning home. Meanwhile, Berta joined Small in the Lincoln and drove up on the Florida Turnpike directly behind the Zayre store. They parked the Lincoln on the berm of the road and hung a sign in the window that said "Out of Gas—Will Return Shortly," although the gas tank was actually more than half full.

Berta and Small walked down the slope of the turnpike and entered the back portion of the mall through a narrow gap in the fence behind Zayre's. They walked to the parked Aspen and entered the car. Berta sat in the driver's seat and read a newspaper. Small ducked down and remained out of sight in the back seat. Berta checked his watch repeatedly.

At approximately 9:25 a.m., a Loomis armored car approached the Las Americas mall. At the same moment, however, a woman and a small child had wandered to the front of the Zayre department store so the child could play on a carousel. Small and Berta were less than ten yards away, poised in their parked car for the arrival of the armored car. Special Agent Stephen Warner immediately directed the manager of Zayre's to invite the mother and child into the store for a "pre-opening sale," in order to avoid the prospect of innocents caught in a crossfire.

Seconds later, as the Loomis car pulled in front of Zayre's, Special Weapon and Tactic (SWAT) agents rapidly converged on Small and Berta and ordered them out of the Dodge Aspen. They were arrested and handcuffed. On the seat next to Berta, agents found a sawed-off twelve-gauge shotgun loaded with five rounds of buckshot, including a round in the chamber of the shotgun. On the floor of the backseat, agents found a fully loaded Colt .38 super automatic pistol, a black ski mask, and gloves.

FBI agents then surrounded Kimmons' residence, ordered him out of his house, and placed him under arrest. Agents conducted a protective security sweep of the inside of the residence and found, inside a hall closet, a Ruger Mini–14 semi-automatic assault rifle with a taped, double magazine loaded with sixty rounds of ammunition. After giving *Miranda* warnings at the scene, agents took Kimmons to FBI headquarters.

Agent Warner again read Kimmons his rights. Kimmons said he understood his rights and that he would not make a statement until he spoke with his attorney. Agent Warner discontinued questions regarding the case but told Kimmons that he desired his cooperation concerning a search of the residence. After Warner read Kimmons a "consent-to-search" form, Kimmons stated that a search warrant was inevitable and signed the form.

A search of the residence uncovered several weapons, including a modified fully automatic nine millimeter Intratech pistol, a thirty-round magazine, two silencers, .38 caliber super automatic ammunition, a

Mossberg twelve-gauge shotgun, another Ruger assault rifle, various shotgun shells, and two portable police radio scanners. The serial numbers on the weapons had been partially obliterated. Receipts found in Kimmons' bedroom showed that three of the weapons had been purchased by Kimmons' girlfriend, Barbara Rodriguez.

On October 31, 1989, a federal grand jury returned a superseding indictment against the defendants. Count I charged all three defendants with conspiracy to affect commerce by robbery of armored car companies, in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Count II charged them with attempting to affect commerce by robbery of employees of Loomis Armored, Inc., in violation of 18 U.S.C. §§ 2 and 1951(a). Count III charged Berta with possession of a short-barrelled shotgun with no serial number, in violation of 26 U.S.C. § 5861(h) and 5871. Count IV charged Berta with carrying a Mossberg twelve-gauge shotgun during a federal crime of violence, in violation of 18 U.S.C. § 924(c)(1). Count V charged Small with carrying a Colt pistol during a federal crime of violence, in violation of 18 U.S.C. § 924(c)(1). Count VI charged Kimmons with possession of a silencer in violation of 26 U.S.C. §§ 5861(d) and 5871. Count VII charged Small with violation of the Armed Career Criminal Act, 18 U.S.C. § 922(g)(1). Count VIII charged Kimmons with the same offense.

Berta pled guilty to all relevant counts of the indictment on February 14, 1990. After a six-day jury trial beginning February 16, 1990, Small and Kimmons were convicted on all applicable counts. Under the Sentencing Reform Act of 1984, Berta received concurrent sentences of sixty-three months on Counts I, II, and III. He received a consecutive sixty-month sentence on Count IV, for a total sentence of 123 months. Small received the following concurrent sentences: twenty years each for Counts I and II, five years on Count V, and life imprisonment on Count VII. Kimmons received similar concurrent sentences: twenty years each for Counts I and II, five years on Count VI, and life imprisonment on Count VIII.

## II. DISCUSSION

The appellants-defendants raise several issues regarding the validity of their convictions and the district court's application of the Sentencing Guidelines. We turn first to two arguments requiring more careful comment, and then briefly address the remaining claims.

*Conspiracy Count Sentence Enhancement*

■ Appellant Berta challenges the district court's application of a conspiracy count sentence enhancement under Guideline § 1B1.2(d)[1] as a violation of the ex post facto prohibition. The Guideline section was not in effect at the time of the offense, although it had been added by the time of sentencing.[2] Berta asserts that § 1B1.2(d) operated retrospectively and disadvantaged him by requiring an increase of three units above the base offense level, thus violating the ex post facto clause of the Constitution, U.S. Const. art. I, § 9, cl. 3. *See Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (Florida trial court's application of the Florida sentencing guidelines violated ex post facto prohibition.). Our review is de novo. *United States v. Goolsby,* 908 F.2d 861, 863 (11th Cir.1990) ("Interpretation of the Sentencing Guidelines ... is subject to de novo review on appeal.").

Berta's argument is identical to one recently rejected by the Seventh Circuit in *United States v. Golden,* 954 F.2d 1413 (7th Cir.1992). In *Golden,* the defendant was indicted on one count of conspiracy to commit arson and two counts of arson. *Id.*

---

1. Guideline § 1B1.2 provides, in relevant part, that a "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted of a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2

2. Pursuant to 18 U.S.C. § 3553(a)(4) and (5), sentencing courts must abide by the Sentencing Guidelines and policy statements in effect on the date of sentencing, not on the date of the offense.

at 1414. He pled guilty to the conspiracy charge and the remaining charges were dismissed. *Id.* at 1415. The district court adjusted the defendant's guilty plea upwards by two levels under Guideline § 1B1.2. *Id.* at 1416. Although, as here, § 1B1.2 was adopted after the defendant's offense, the district court dismissed the defendant's ex post facto argument because § 1B1.2 was not a "substantive" change in the law, but simply an explanation of the "intentions of the Guidelines drafters." *Id.*

The Seventh Circuit affirmed, stating that "no ex post facto violation occurs if the change in the law is merely procedural and does not 'increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt.'" *Id.* at 1417 (quoting *Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)). The court concluded:

> [W]hen viewed in the context of other Guidelines provisions—each in existence at the time of [the defendant's] sentencing—there can be little question that the sentencing court was already required to treat a conspiracy charge as if it were several counts, each charging a conspiracy to commit a substantive offense. In particular, the introductory comment to the chapter on "Multiple Counts" indicates that conspiracy is a composite offense which may include several underlying offenses. And even more illustrative is note 9 to Guidelines § 3D1.2, which provides in relevant part:
>
> > A defendant may be convicted on conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the vari-

ous acts cited by the conspiracy count that would constitute behavior of a substantive nature.

> In short, Guidelines § 1B1.2(d) was enacted for [sic] sole purpose of clarifying then existing procedure, and therefore no ex post facto concerns can legitimately be raised.

*Id.* at 1417–18 (footnotes omitted).

We agree with the Seventh Circuit and find the appellant's ex post facto argument without merit for the reasons expressed in *Golden.*

■■■ Berta also challenges the enhancement of his sentence as related to the activities directed toward the Wells Fargo car at the Coral Gables Federal Savings & Loan and the Brinks car at the Ocean Bank and Flagler Bank branches based on lack of notice and insufficient evidence. He asserts that Count I made no mention of multiple objectives,[3] and that there was little or no evidence to support the district court's determination of multiple offenses.

Berta insists that he only conspired to rob the Loomis car at Zayre's and that there is "no quality of evidence or any stretch of the facts" which would support a finding that the appellants conspired to rob any other armored car. Brief of Appellant Berta at 34. He contends that his and his co-defendants' surveillance of the Wells Fargo and Brinks armored cars at most amounted to "shopping a robbery," and that they were simply "looking for the most likely and easiest victim," *id.* at 35, but that there is no evidence of any agreement to rob either the Wells Fargo or Brinks cars.

At the sentencing hearing, the district court found otherwise:

> As far as the issue of the conspiracy is concerned, there is ample evidence in the record, as outlined by the Federal Agents, as to the number of conspiracies involved.

---

**3.** We find no merit in Berta's notice argument. Count I of the superseding indictment expressly charges "that the defendants conspired to unlawfully take currency from the custody of *em-* *ployees of armored car companies* ... in violation of Title 18, United States Code, Section 1951(a)." (R1:29 at 1–2) (emphasis added).

There were several prior efforts to do bank robberies, like the armored car robberies. They did not go down.

One, for example, involved the question—and they saw a heightened security on the armored car because the FBI had advised them that there was an alert, and the FBI Agent's testimony outlined those events.

So, I think there is sufficient evidence of the pre-conspiracy. Additionally, the count does sufficiently charge and puts the defendant on notice concerning multiple conspiracies.

So, I have no problem with ruling against the defendant on that issue.

(R10:43).

In reviewing a sentence under the Guidelines, the factual findings of the sentencing court are entitled to great deference and must be accepted unless clearly erroneous. 18 U.S.C. § 3742(e) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous...."); *see United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989); *United States v. Spraggins*, 868 F.2d 1541, 1543 (11th Cir.1989).

Berta does not dispute that along with his co-defendants he conspired to rob the Loomis armored car. He does challenge that his co-defendants' scrutiny of the Wells Fargo and Brinks cars were separate and independent offenses. A review of the record, however, supports the district court's finding that the conspiracy had multiple objectives. It may be inferred from the Federal agent's testimony that the appellants followed and deliberately observed the Wells Fargo car as it delivered cash at the Coral Gables Federal Savings & Loan off Bird Road. (R5:33–36). There is further testimony revealing that the appellants likely saw the extra Wells Fargo armed security guards before the appellants turned away. (R5:34; R7:126). Federal agents further testified that the appellants drove to the Las Americas mall and monitored the Wells Fargo and Brinks cars as they delivered cash at Woolworth's and the Ocean Bank and Flagler Bank branches. (R6:45–53, 56–60). The appellants watched the armored cars from different perspectives on at least three different days. (R6:60–62, 88–92, 99–103).

These exploits amounted to independent overt acts in furtherance of the conspiracy. *See United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir.1988) ("To support a conspiracy conviction, the government must prove 1) an agreement to commit unlawful act and 2), an overt act by one conspirator in furtherance of conspiracy."). Berta's more thorough attempt to rob the Loomis car does not negate that, along with his co-defendants, he also carefully monitored the activities of the Wells Fargo and Brinks trucks. The appellants could have chosen to rob one or all of the armored cars, but as the district court noted, the earlier offenses simply "did not go down." (R10:43). Accordingly, we affirm the district court's enhancement of the sentence imposed under the conspiracy count in accord with § 1B1.2(d) of the Guidelines.[4]

---

4. Moreover, if any error occurred in the application of the Guidelines, it occurred in appellant Berta's favor. The district court, relying on the Pre-Sentence Investigation Report, calculated a base offense level of 18 under Guideline § 2B3.1(a), increased the offense level by 4 under § 2B3.1(b)(1)(E) because the potential loss approximated $500,000, added another 3 levels pursuant to § 2B3.1(b)(2)(C) because codefendant Small possessed a firearm, added 3 more levels for the multiple offenses under § 1B1.2(d), and subtracted 2 levels under § 3E1.1(a) for Berta's affirmative acceptance of responsibility, for a total offense level of 26. At the time of sentencing, Criminal History Category I of the Guidelines Sentencing Table imposed an incarceration range of 63 to 78 months. The district court imposed a minimum sentence of 63 months running concurrently on each of the conspiracy counts.

However, under Appendix C, amendments 110 and 111, of the Sentencing Guidelines, effective November 1, 1989 and applying on the date of sentencing, April 25, 1990, the base offense level under § 2B3.1(a) was 20. The enhancement for the potential loss under § 2B3.1(b)(1)(E) was 3, not 4 as reflected in the PSI report. The adjustments calculated properly would have raised Berta's offense level to 27. At that level, the sentencing range increased to 70 to 87 months. Had the Guidelines been

*Kimmons' Motion to Suppress*

■ Appellant Kimmons challenges the introduction into evidence of the Ruger Mini–14 assault rifle and ammunition found during a protective sweep of his residence immediately following his arrest. He argues that agents lacked exigent circumstances to require him to leave his residence without an arrest warrant or to conduct a protective sweep without a search warrant. Kimmons further asserts that his subsequent consent to a search was involuntary because of the totality of the circumstances. We address each assertion in turn. Our review of the facts is construed in the light most favorable to the party who prevailed in the district court. *See United States v. Alexander,* 835 F.2d 1406, 1408 (11th Cir.1988) (District court's findings of fact at suppression hearing are reviewed under a clearly erroneous standard.).

Relying on *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *United States v. Maez,* 872 F.2d 1444 (10th Cir.1989), Kimmons claims that the Federal agents' show of force outside his home coerced his exit in violation of the Fourth Amendment. In *Payton,* the Supreme Court held that the Constitution prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in the absence of exigent circumstances. 445 U.S. at 583–603, 100 S.Ct. at 1378–1388. In *Maez,* the Tenth Circuit found a *Payton* violation where armed officers, having no warrant for an arrest, surrounded a mobile home and demanded over loud speakers that the occupants remove themselves from the home so that a suspect could be taken into custody. 872 F.2d at 1449–53. Kimmons argues that the force used by the government in his arrest was comparable to the force found violative of the Fourth Amendment in *Maez.* Moreover, Kimmons contends that the government cannot justify that use of force through exigent circumstances because such an argument was never made in the district court.

■ The record, however, indicates that the government indeed argued exigent circumstances,[5] circumstances which we find compelling on review. As we noted in *United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986):

> A finding of probable cause alone ... does not justify a warrantless arrest at a suspect's home. Exigent circumstances which make it impossible or impractical to obtain a warrant must also be present.

---

strictly followed, Berta would have suffered an even greater penalty.
The government did not appeal the sentence.

5. In *United States v. Maez,* 872 F.2d 1444, 1452 & n. 9 (10th Cir.1989), the Tenth Circuit never reached the merits of the government's argument of exigent circumstances because it had been raised for the first time on appeal. Here, the record discloses the following argument by government counsel on the motion to suppress:

> MR. TAMEN [AUSA]: Judge, the case that established the law regarding warrantless arrests of violence inside a house made it clear—Peyton [sic] versus New York—a warrant that has been in existence for a period of time or case, an investigation of a case that has been completed for some time period which requires police to obtain a warrant before entering a house.
>
> This is a different situation. We have a situation in which three men, two of whom are known to be dangerous, to have lengthy criminal histories involving robberies are arrested at a shopping center in the morning, at a time when it's open for business to the public.
>
> They have ski masks, gloves, sawed off shotguns and a pistol in the car.
>
> The weapons are all loaded. They are apprehended where the armored car arrives at the scene, moments before they would have jumped out with guns to commit that armed robbery and a third member of the conspiracy, who has been stalking armored cars along with them for a period of 4 months is back at the house.
>
> *There are exigent circumstances there.* The police cannot arrest the two men at the shopping center and wait around until tomorrow to get the guy who is at the house, who is a member of the conspiracy, who assisted in setting up the scene at the shopping center that very morning.
>
> They have to take him out for the protection of the public. *They had more than ample exigent circumstances, either to go in the house and get him, or make him come out, which they did.*

(R4:83–84) (emphasis added).
Because the government's counsel argued exigent circumstances before the district court, the appellant's reliance on *Maez* is misplaced.

The exigent circumstances exception encompasses situations such as hot pursuit of a suspect, risk of removal or destruction of evidence, and danger to the arresting officers or the public.

(citation omitted). In *Edmondson,* we did not find exigent circumstances because none of the situations outlined above were present and because "the circumstances did not otherwise make it impossible or even imprudent" for the agent to obtain an arrest warrant.[6] *Id.* In addition to those situations noted in *Edmondson,* exigent circumstances may be indicated by the presence of other relevant factors, such as those set forth in *United States v. Standridge,* 810 F.2d 1034, 1037 (11th Cir.1987), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987):

> Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public.

We find that the circumstances here include the factors set forth in *Standridge.* The FBI had just apprehended two of Kimmons' accomplices seconds before they were about to commit a daylight armed robbery in a busy shopping center. They were armed with a fully loaded sawed-off shotgun and pistol. The FBI knew that Kimmons had been part of the conspiracy for at least six weeks, that he had been at the crime scene that very morning, and that he had a history of violent crime. Kimmons' participation in a plan to rob armed security personnel also showed a present willingness to use violence. Moreover, Kimmons' home had served as the headquarters for the conspiracy, and it was highly likely that evidence would be concealed inside. Finally, with Kimmons awaiting the return of his co-defendants and likely surmising that the robbery had misfired, any further delay on the part of the FBI would have given Kimmons more time to prepare for either violent resistance or an attempt to escape. Consequently, we find sufficient exigent circumstances to justify the arrest.

Kimmons next challenges the security sweep that immediately followed his arrest, claiming that the Supreme Court has not recognized a "protective sweep" exception to the search warrant requirement. However, in *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990), the Supreme Court held:

> that the Fourth Amendment would permit [a] protective sweep undertaken ... if the searching officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing" that the area swept harbored an individual posing a danger to the officer or others.

(quoting *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3481–82, 77 L.Ed.2d 1201 (1983) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968))).

Here, the circumstances fall well within the exception set forth in *Buie.* In addition to the dangerous exigencies noted above, the FBI had knowledge of a fourth conspirator whose identity and whereabouts were unknown, which further heightened concern at the site of Kimmons' arrest.[7] *See United States v. Burgos,* 720

---

6. In *Edmondson,* the FBI tracked the license plate of a car used in an aborted bank robbery to an apartment address. 791 F.2d at 1513. An agent saw a man resembling the suspect in a bank surveillance photograph step outside the apartment onto a landing to smoke a cigarette and return inside. *Id.* Without an arrest or search warrant, and with weapons drawn, the FBI surrounded the apartment and yelled for the suspect to open the door. *Id.* at 1514.

7. Under direct examination, Special Agent Stephen Warner, who commanded the operation, testified:

F.2d 1520, 1525–26 (11th Cir.1983) (upholding a security sweep where house was likely laden with firearms and an unknown number of people were inside). The sweep did not last any longer than needed to complete Kimmons' arrest and secure the premises. Moreover, the seizure was lawful because the weapons and ammunition were found in plain view. *See Buie*, 494 U.S. at 330, 110 S.Ct. at 1096.

■ Finally, Kimmons complains that his subsequent consent to search was involuntary based on the totality of the circumstances. He concedes that under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), his consent was voluntary if viewed independently from the initial arrest. Reply Brief of Appellant Kimmons at 7. Nonetheless, he alleges that because his arrest was illegal, his subsequent consent to search while in custody is invalid. *See United States v. George*, 883 F.2d 1407 (9th Cir.1989) (finding that consent to search was tainted by earlier illegal home arrest). However, as his arrest was lawful and evidence indicates that Kimmons was aware of his right of refusal before he signed the consent form,[8] *see United States v. Smith*, 543 F.2d 1141, 1145 (5th Cir.1976) (Where the trial court makes no factual findings on an issue, the appellate court may affirm the ruling based upon facts in the record that support the decision.), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977), we find that Kimmons' consent was freely and voluntarily given.

Q [AUSA Tamen]: What did the agents on the scene do after he came outside and was arrested?
A: Other agents were transporting Mr. Small and Mr. Berta.
Mr. Kimmons was transported to our office. Two agents along with myself went inside. We knew there was another white female inside we had seen at the door.
We went inside, did a protective sweep of the inside of the residence to see if anybody else was inside other than the white female.
Q: In connection with the protective sweep, had Mr. Kimmons and Mr. Small been known to associate with yet another who was not [arrested] that morning?
A: Yes.
Q: Did you know where that individual was at the time you [arrested] Mr. Kimmons?
A: No.
(R4:18).
Q: Did concern about the whereabouts of this individual figure in your decision to make a security sweep of the residence?
A: Yes.
(R4:20).

8. Assistant United States Attorney Frank Tamen elicited the following testimony from Special Agent Stephen Warner regarding Mr. Kimmons' signing of the consent to search form:
Q: Was it your desire at that time to perform a search of his residence?
A: Yes.
Q: Did you advise him of that fact?
A: Yes.
Q: What was it you told him about searching his residence?
A: Well, at that point in time I didn't have a Consent to Search form on me.
They were trying to transport the individuals out of the building and when I confronted him with that he was downstairs in our fingerprint and mug room area.
Q: What was it you told him?
A: I basically said "I'm trying to solicit your cooperation concerning the search of your residence."
Q: How did he respond?
A: I started reading the consent form to him. In the middle—I mean, I just began reading it. He reached out his hand for the form and stated something to the effect that *"You will get a warrant anyway. I'll sign the form."*
And I said "Excuse me?" and he said something to that effect again. I said "I realize you don't have your glasses. Let me finish reading the form."
He told me before he didn't have his glasses. He couldn't read the form. I continued reading the form to him.
After I got done reading the form, I asked if he understood his rights and he said "Yes." I then stated "You were right about the warrant. I mean, it's my obligation. I can contact the United States office regarding a search warrant or a, or probable cause to search your residence, but I am soliciting your consent to search the residence."
He said *"Give me the form. I will sign it. You will get a warrant anyway."*
(R4:23–24) (emphasis added).
As the Supreme Court has recognized, "[t]here might be rare cases where it could be proved from the record that a person in fact affirmatively knew of his right to refuse—such as a case where he announced to the police that if he didn't sign the consent form, 'you [police] are going to get a search warrant.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 229–30, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973). This is one of those rare cases.

*The Remaining Claims*

■ The appellants raise several additional claims that require less comment. Berta and Small challenge the district court's four level increase under Guideline § 2B3.1(b) based on a calculation that the loss from the offense would have been approximately $500,000. The appellants assert that the potential loss was only $67,000, because that was the sum that the Loomis truck would have picked up from Zayre's on the morning of the attempted robbery. However, the target of the robbery was the money already in the Loomis truck as well as the money from the store. Otherwise, the appellants might simply have planned to rob the store instead of the armored car. Testimony from managers of all three intended victim corporations established that hundreds of thousands to millions of dollars were carried on the armored cars during the specific routes that the appellants had targeted. (R8:81, 84, 88, 92). The district court's factual finding of a potential loss of $500,000 is supported by a preponderance of the evidence. *See United States v. Ignancio Munio,* 909 F.2d 436, 439 (11th Cir.1990) (The facts underlying a sentence must be established by a preponderance of the evidence.), *cert. denied,* —— U.S. ——, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991).

■ Berta and Small also argue that the district court erroneously enhanced their sentences by three levels under Guideline § 2B3.1(b)(2)(C) because each co-defendant carried a firearm during the commission of the conspiracy. Each was sentenced to a sixty-month term of incarceration for violating 18 U.S.C. § 924(c). The appellants assert that the guideline application amounted to "double-counting," which Guideline § 2K2.4 prohibits. However, the district court's application of § 2B3.1(b)(2)(C) to each appellant did not "double count" because it involved neither the same firearm nor the same possession for which a penalty was imposed under 18 U.S.C. § 924(c). *See United States v. Ote-*

ro, 890 F.2d 366, 367 (11th Cir.1989) (setting forth criteria for establishing defendant's liability for enhancement under guidelines for firearm possessed by co-defendant). Berta was convicted for possessing a twelve-gauge shotgun, but his three-level enhancement was based upon co-defendant Small's firearm possession. Similarly, Small was convicted for possession of a Colt pistol, but the enhancement of three levels was based upon co-defendant Berta's possession of a different firearm. Because two armed men perpetrating a robbery pose a much greater threat to the public safety than only one armed robber, it is proper to increase each defendant's guideline score to reflect this more serious conduct.

■ Small further challenges his sentence pursuant to 18 U.S.C. § 924(e)(1), stating that he was charged in Count VII with violating 18 U.S.C. § 924(a)(1)(B), which carries a maximum term of only five years. Thus, Small contends, he was not legally on notice of his offense and the potential penalty of life imprisonment. However, in the same count, the indictment also charged him with violating 18 U.S.C. § 922(g)(1). The indictment not only specified the elements of the offense under 18 U.S.C. § 922(g)(1), but also specified the convictions that established Small's eligibility for the potential life sentence carried under that section. The government concedes that it incorrectly included 18 U.S.C. § 924(a)(1)(B) in Count VII, but notes that the reference is merely surplusage given that the district court disregarded it and properly applied § 924(e)(1) pursuant to § 922(g)(1). We agree. The enhanced penalty provisions of 18 U.S.C. § 924(e)(1) are not elements of the offense and need not be set forth in the indictment. *See United States v. McGatha,* 891 F.2d 1520, 1524–25 (11th Cir.), *cert. denied,* 495 U.S. 938, 110 S.Ct. 2188, 109 L.Ed.2d 516 (1990).

■ We find no merit in the remaining claims.[9] Accordingly, we AFFIRM the

---

9. Small challenges his conviction under Count VII because the verdict form returned by the jury contains a check by Count VIII instead.

Count VII and Count VIII charge the same offense, except that Count VII relates to Small and Count VIII to Kimmons. There was no Count

challenged convictions and the sentences the district court imposed on each defendant.

CLARK, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with the majority on all points except one. I conclude that the district court erred in treating defendants' single conspiracy conviction as three offenses for purposes of U.S.S.G. § 1B1.2(d). Accordingly, I would find that the resulting three level increase in each defendants' offense level is erroneous and remand the case for resentencing based upon a proper application of § 1B1.2(d).

Pursuant to U.S.S.G. § 1B1.2(d), a conviction on a count charging a conspiracy to commit more than one offense must be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit. Such treatment, in effect, results in a new count of conviction for purposes of sentencing. Accordingly, as the commentary to § 1B1.2(d) makes clear, this guideline must be applied cautiously:

> Particular care must be taken in applying subsection (d) because there are cases in which the jury's verdict does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.[1]

Thus, this instruction admonishes the district court to exercise "particular care" in determining whether a defendant has conspired to commit more than one offense for purposes of § 1B1.2(d). The commentaries to the guidelines also make clear that, in making this determination, the district court must apply a reasonable doubt standard, rather than the preponderance of the evidence standard generally applicable to sentencing issues. The appendix explaining the commentary quoted above provides:

> In order to maintain consistency ..., this decision should be governed by a reasonable doubt standard. A higher standard of proof should govern the creation of what is, in effect, a new count of conviction....[2]

Thus, application of § 1B1.2(d) is appropriate only if the evidence shows *beyond a reasonable doubt* that the defendant committed more than one conspiracy.

In this case, the probation officers who drafted defendants' presentence investigation reports represented that "defendants were involved in monitoring the pickup and delivery practices of three armored car companies: Wells [Fargo], Brinks, and Loomis."[3] Relying solely on this "monitoring" activity, the probation officers applied § 1B1.2(d), thereby, in effect, converting defendants' one conspiracy conviction into three. At the sentencing hearing, the

VII on either verdict form. However, because the district court carefully instructed the jury that Small and Kimmons were charged with the same offense in separate counts, (R9:223), and the jury returned guilty verdicts on all counts for each defendant, we find no reversible error. *See United States v. Rosenthal,* 793 F.2d 1214 (11th Cir.1986) (As each count in an indictment is separately considered, it may stand if supported by the evidence.), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *cf. Shelton v. United States,* 235 F.2d 951, 954 (4th Cir.1956) (recognizing that a verdict may stand, notwithstanding certain flaws, "if the meaning of the jury is clear beyond a reasonable doubt and the verdict as finally recorded sets out their intention.").

Nor do we find merit in Kimmons' assertion that the district court erred when it denied the introduction of a hearsay statement by Small, *see United States v. Bagley,* 537 F.2d 162, 166–67

(5th Cir.1976) (A trial court's finding as to the trustworthiness of a hearsay declaration offered pursuant Fed.R.Evid. 804(b)(3) to exculpate the defendant will be sustained unless clearly erroneous.), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), or in Kimmons' claim that the evidence was legally insufficient to support his conviction under Counts VI and VIII, *see United States v. Mena,* 863 F.2d 1522, 1529 (11th Cir.) (Evidence must simply be sufficient to prove the defendant's guilt beyond a reasonable doubt when viewed in the light most favorable to the government.), *cert. denied, 493 U.S. 834,* 110 S.Ct. 109, 107 L.Ed.2d 72 (1989).

1. U.S.S.G. § 1B1.2(d), comment. (n. 5)

2. U.S.S.G. App. C ¶ 75.

3. Presentence investigation reports at 11.

district court overruled defendants' objections on this point, apparently finding that there was sufficient evidence to conclude that defendants conspired to rob *each* of the three armored car companies. Applying the guidelines and commentaries quoted above, we may uphold this conclusion only if there was sufficient evidence for the district court to find *beyond a reasonable doubt* that defendants conspired to rob *each* of these three companies.

At trial, federal agents testified that defendants *observed* a Wells Fargo armored car and a Brinks armored car; there is no evidence that defendants ever took any steps, other than mere observation, toward robbing either of these cars. Indeed, the only testimony regarding a Brinks armored car is that of Agent Schopperle, who observed defendant Small at Las Americas shopping center on June 23, 1989. Agent Schopperle testified:

Q: Let me direct your attention to later on that afternoon approximately 2:40 p.m. Did you observe another armored car enter the vicinity of Las Americas Mall?

A: It's possible there might have been a Brinks armored car vehicle come in. During the time I was there I noticed several armored car vehicles come through on different dates.

Q: Do you need to check your logs to refresh your memory as to whether or not the Brinks armored car entered the mall that day?

A: To be one hundred percent certain for the exact time.

Q: Do you have the logs handy?

A: No, I don't.

Q: Let me show you the surveillance log from June 23rd and ask you to review that.

A: Yes, at 2:40 p.m.

Q: Did you observe?

A: I did not, in looking at the log, I did not actually observe, a Brinks armed car did come into the shopping center, but I did not exactly observe its arrival, but I did see it.

Q: When it was in the mall already?

A: After it had gotten there it came to my attention, I do remember seeing it there.

Q: Where did you see it go to or where was it when you saw it?

A: It was west of the Zayre shopping center over here in this area, somewhere west over here.

Q: Did it pull up to a Flagler Federal Savings Bank?

A: Yes, it did.

Q: Is that this bank at the bottom?

A: Yes, I remember the two banks, it was in the general area I observed it.

Q: Where was Mr. Small at that time?

A: I believe he was back over here in the area of the curve, east of that bank.

Q: Did you see what he was doing?

A: He seemed to be observing everything, the activity that was going on in the parking lot. He was watching cars coming and going, vehicles coming and going. Exactly what he was doing other than looking at activity in the shopping center I couldn't be certain.[4]

This is the *only* evidence in the record tending to show any interest on the part of any of the defendants in the Brinks armored car company. This evidence certainly is not sufficient to support a conviction of conspiracy to rob this company.

The majority takes the position that defendants' observation of the Brinks and Wells Fargo armored cars "amounted to independent overt acts in furtherance of a conspiracy." To support a conspiracy conviction, however, the government must also prove that the defendants *agreed* to commit the object offense. Here, there is absolutely no evidence that defendants agreed to rob either the Brinks or the Wells Fargo armored cars. Both of these cars made deliveries in the same vicinity as the Loomis armored car that defendants eventually attempted to rob. That defendants would plan and agree to rob three different armored cars in the same vicinity defies logic. Indeed, the only logical inference that can

---

4. R6–56 through 57.

be drawn from the evidence is that defendants agreed to rob *one* armored car, but observed three separate armored cars in an attempt to find the one target. The majority states that defendants *"could have* chosen to rob one or all of the armored cars...." (Emphasis added.) There is absolutely no evidence, however, that defendants *did* choose to rob all three of the armored cars. Rather, the evidence indicates that defendants chose to rob *one* of the armored cars, the Loomis car, and chose *not* to rob the other two. This simply is not the type of situation that § 1B1.2(d) was intended to reach.

Indeed, this case stands in marked contrast to *United States v. Johnson,*[5] in which the Eighth Circuit upheld a proper application of § 1B1.2(d). *Johnson* involved an attempted bank robbery. The evidence at trial showed that the defendants, a group of co-conspirators, selected two banks to be robbed. These two banks were across the street from each other, and the defendants planned to rob them simultaneously. As the court of appeals noted in affirming the district court's application of § 1B1.2(d), the conspiracy "was directed toward the robbery of two banks, not just one."

Unlike the defendants in *Johnson,* defendants in this case did not plan to rob more than one armored car. Rather, they planned to rob one car, but they observed several in order to pick out the one. Thus, defendants conspired to commit one offense: the robbery of an armored car. That federal agents observed their activity as they chose the target of this one offense does not turn the one offense into three. I would agree with the majority if the evidence showed that defendants actually agreed to rob the Brinks and Well Fargo cars; it does not. The evidence shows only that the defendants agreed to rob an armored car, and subsequently chose Loomis as their target. Defendants simply cannot logically be said to have conspired to rob each of the cars they observed. Accordingly, I would reverse the district court on this point and remand the case for resentencing

in accordance with proper application of § 1B1.2(d).

---

5. *United States v. Johnson,* 962 F.2d 1308, 1992 WL 86203 (8th Cir. May 1, 1992).