**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry GOLDEN, Defendant–Appellant.**

**No. 90–3465.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1991.

Decided Jan. 28, 1992.

Kaarina Salovaara (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Richard H. McLeese, Decker & Associates, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., POSNER and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Larry Golden was indicted with one count of conspiracy to commit arson in violation of 18 U.S.C. § 371, and two counts of arson in violation of 18 U.S.C. § 844. He pled guilty to the conspiracy charge, and was subsequently sentenced to 41 months imprisonment with a three year term of supervised release. Golden now appeals from that sentence. For the following reasons, we affirm.

### I.

Lee Arthur McCorker and his son, James Earl McCorker, owned and operated Mr. Lee's Lounge, a liquor store and part-time nightclub located on Chicago's south side. In 1987, Mr. Lee's Lounge began losing business to the Rainbow Market, another retail food and liquor store which opened across the street. Fearing the loss of his local patronage, Lee McCorker decided to take steps to drive the Rainbow Market out of his neighborhood once and for all.

Larry Golden was an auto mechanic who periodically did electrical work at Mr. Lee's Lounge. In January 1989, while Golden was completing some repairs in the Lounge, Lee McCorker approached Golden and asked him if he would set fire to the Rainbow Market for several hundred dollars. Golden agreed to do so. Shortly thereafter on January 23, 1989, at approximately 2:00 A.M., Golden and a man known only as "Tennessee" climbed onto the roof of the Rainbow Market and poured gasoline down an air vent and into the store. Tennessee then dropped a few matches

down the vent, and after confirming that a fire had started, both men fled the area. Neither made any efforts to determine whether anyone was still in the building.[1]

The ensuing fire caused little damage. Although a part of the roof near a neighboring home was set aflame, fire fighters arrived at the scene quickly enough to contain the blaze before any extensive damage occurred. No civilian or fire fighter injuries were reported.

Lee McCorker, not satisfied with the results of the January 23 fire, recruited Golden to make a second attempt for the sum of three hundred dollars. Once again, Golden agreed. On February 4, 1989, at approximately 4:00 A.M., Golden returned to the Rainbow Market, accompanied by Tennessee and Mecella Walker, one of McCorker's employees. While Walker remained on the street to serve as a lookout, Golden and Tennessee poured gasoline down a hole in the roof where the first fire had burned. Golden also prepared several "Molotov cocktails," filling empty glass bottles with gasoline and a rag wick. They then ignited the "cocktails" and tossed them into the market. The store rapidly became engulfed in flame.

The destructive force of this second fire was considerable. Although the flames were extinguished by the store's sprinkling system before any structural damage occurred, the resulting smoke damaged the entire inventory and most of the business equipment, including several freezers. No one, however, was injured.

Lee McCorker paid Golden his predetermined "fee" on the morning following each fire. Golden in turn distributed a small portion of that payment to both Tennessee and Walker.

Shortly after the second fire, the police commenced an undercover investigation which culminated in Golden's arrest on April 13, 1989. Golden was subsequently indicted on one count of conspiracy to destroy the Rainbow Market by arson in violation of 18 U.S.C. § 371, and two counts of arson in violation of 18 U.S.C. § 844(i). On March 7, 1990, he pled guilty to the § 371 conspiracy count. The remaining charges against him were subsequently dismissed.

On October 23, 1990, the district court sentenced Golden to 41 months imprisonment, the minimum sentence in the applicable Sentencing Guidelines range. In reaching this conclusion, the court first set the base level for Golden's offense at six, subject to enhancement.[2] Pursuant to Guidelines § 2K1.4, the court then increased that base offense by 14 level on the grounds that Golden "recklessly endangered the safety of another."[3] The court reasoned as follows:

> The defendants in this case conspired, and participated in the arson of a building in an urban area. Each and every participant in the conspiracy recognized that fires kill people, and that a fire which starts one place can spread and burn down other buildings. Further, no participant in this conspiracy bothered to verify that no one was in the Rainbow Market by calling the store before it was set on fire. The defendants acted with little regard for whether their conduct would endanger others, and that is exact-

---

1. In the presentence report, the probation officer stated that there was no information indicating that Golden "searched the building to ensure that there was no one inside prior to setting the fires." Golden never challenged this factual finding.

2. Guidelines § 2X1.1(a) provides that the base level for the conspiracy charge to which Golden pled guilty is the same as that for the object of the conspiracy—arson, in this case.

3. At the time of Golden's offenses and sentencing, Guidelines § 2K1.4 provided, in relevant part:

Arson: Property Damage by Use of Explosives
(1) If the defendant knowingly created a substantial risk of death or serious bodily injury, increase by 18 levels.
(2) If the defendant recklessly endangered the safety of another, increase by 14 levels.
(3) If the offense involved destruction or attempted destruction of a residence, increase by 12 levels.
The district court rejected the government's suggestion that an 18 level increase under § 2K1.4(1) was appropriate in this case.

ly the sort of conduct that "reckless-ness" encompasses.

The district court next determined that Golden's guilty plea should be adjusted upwards "as if the defendant had been convicted of a separate count of conspiracy for each offense that [he] conspired to commit," and that those two convictions should not be grouped under Guidelines § 3D1.2. In so ruling, the district court relied on Guidelines § 1B1.2, which provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted of a separate count of conspiracy for each offense that the defendant conspired to commit." Although § 1B1.2 was adopted after the date of Golden's offense, the district court dismissed Golden's ex post facto concerns on the grounds that the provision was not "substantive," but rather only explained the intentions of the Guidelines drafters. Accordingly, Golden's offense level was adjusted upwards by two more levels.

Finally, the district found that Golden was an "organizer" within the meaning of Guidelines § 3B1.1(c), warranting another two level increase—and thereby bringing his total offense level to 24. This appeal followed.

## II.

*Enhancement for Reckless Endangerment*

Golden first challenges the 14 level enhancement under Guidelines § 2K1.4, arguing that the district court did not find, nor was there any evidence to suggest, that the fires started by Golden actually endangered anyone. To support this contention, Golden asserts that there was in fact no person in the vicinity of the Rainbow Market at the time of either fire. Absent any evidence to the contrary, Golden concludes that the district court committed reversible error by finding that he "recklessly endangered the safety of another" under § 2K1.4.

■ We review challenges to a district court's sentencing determination under a deferential standard. *United States v. Boyer*, 931 F.2d 1201, 1203–04 (7th Cir. 1991). To the extent that the sentencing determination turns on question of fact, the district court's findings will not be disturbed unless we are left "with the definite and firm conviction that a mistake has been committed." *Id.* at 1204; *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989); *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989). This deferential standard of review similarly applies to the district court's decision to adjust a base offense level under Guidelines § 2K1.4. *United States v. Medeiros*, 897 F.2d 13, 17 (1st Cir.1990); *see also United States v. Wilson*, 927 F.2d 1188, 1190 (11th Cir.1991) (in reviewing a challenge to an enhancement under § 2K1.4, the appellate court "will not disturb the district court's factual findings as to the extent of the danger to others caused by appellant's actions unless clearly erroneous"); *United States v. Bos*, 917 F.2d 1178, 1182 (9th Cir.1990) (district court's fact findings relating to sentence enhancement pursuant to § 2K1.4 were neither conclusory nor clearly erroneous). By contrast, a question involving the interpretation of a Guidelines term is a matter of law subject to *de novo* review. *Boyer*, 931 F.2d at 1204; *United States v. Teta*, 918 F.2d 1329, 1332 (7th Cir.1990).

■ A review of the record fully supports the district court's decision to enhance Golden's sentence under § 2K1.4. On two separate occasions, Golden and others attempted to burn down the Rainbow Market with dangerous combustibles—either free-flowing gasoline and/or Molotov cocktails—designed to ignite and spread fire quickly. At neither time did Golden or his co-conspirators make any efforts to determine if anyone was in the store before setting it ablaze. Nor did they pay any heed to the danger of igniting the neighboring homes. In short, Golden's sole intention was that the Rainbow Market be completely destroyed in the flames; collateral damage and injury were, apparently, of little or no consequence.

Golden's assertion that no one was "actually" endangered by either fire grossly mis-

characterizes the nature of his offense. In this day and age, the arson of an urban structure—whether residential or commercial—is virtually a per se reckless endangerment of others. As the district court pointed out, Golden's claim that he was not personally aware that his conduct might endanger other people is "incredible." Even if a building is abandoned, there is always the chance that someone might be inside, or that a fire fighter may be injured or killed while putting out the flames. It is also common knowledge that fires which cannot be quickly contained will often spread to other structures and thereby amplify the risk of injury to additional civilians and fire fighters. In light of these everyday realities, Golden's claim of ignorance rings hollow.

Of course, the arson of an urban building which is altogether isolated may not present the same degree of danger to neighboring structures. However, such is not the case here: the record clearly indicates that the Rainbow Market was located in a residential neighborhood, and that the home nearest the store was in danger of being set aflame. We therefore hold that the district court appropriately enhanced Golden's sentence based on it finding that Golden specifically intended to start a fire which recklessly endangered others.

*Multiple Counts Adjustment*

Golden next challenges the district court's application of a multiple counts adjustment pursuant to Guidelines § 1B1.2(d), a provision added after Golden's offense but in effect at the time of sentencing. Golden asserts that § 1B1.2(d) implemented substantive changes that adversely affected his sentencing by requiring his base offense level to be increased by an additional two units. As a result, Golden concludes that the district court's retroactive application of § 1B1.2(d) to his offense violated the ex post facto clause of the Constitution.

■ The Sentencing Reform Act of 1984 explicitly states that in imposing sentences, courts should consider Guidelines and policy statements which are in effect on the date of sentencing. 18 U.S.C. § 3553(a)(4) and (5).[4] Yet the sentencing application of post-offense Guideline amendments will be held to violate the ex post facto prohibition if (1) the amendment operates retrospectively, and (2) the amendment disadvantages the offender affected by it. *See Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); *United States v. Lam Kwong–Wah,* 924 F.2d 298, 304 (D.C.Cir.1991); *United States v. Harotunian,* 920 F.2d 1040, 1040–41 (1st Cir.1990); *United States v. Stephenson,* 921 F.2d 438, 440–41 (2d Cir.1990); *United States v. Morrow,* 925 F.2d 779, 782 (4th Cir.1991); *United States v. Swanger,* 919 F.2d 94, 95 (8th Cir.1990); *United States v. Restrepo,* 903 F.2d 648, 655 (9th Cir.), *reh'g granted,* 912 F.2d 1568 (1990). Even if a law works to the offender's detriment, however, the ex post facto prohibition does not restrict "legislative control of remedies and modes of procedure which do not affect matters of substance." *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977). In other words, no ex post facto violation occurs if the change in the law is merely procedural and does not "increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt." *Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884).

■ Although we recognize that the substance-procedure dichotomy is, to some extent, largely a question of degree, we do not believe that § 1B1.2(d) can fairly be regarded as a "substantive" change in the Guidelines. When viewed in the context of other Guidelines provisions—each in existence at the time of Golden's sentencing—

---

**4.** 18 U.S.C. § 3553 provides:
(a) The court, in determining the particular sentence to be imposed, shall consider ... (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed ... as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date the defendant is sentenced; (5) any pertinent policy statement issued by the Sentencing Commission pursuant to 29 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced.

there can be little question that the sentencing court was already required to treat a conspiracy charge as if it were several counts, each charging a conspiracy to commit a substantive offense.[5] In particular, the introductory comment to the chapter on "Multiple Counts" indicates that conspiracy is a composite offense which may include several underlying offenses.[6] And even more illustrative is note 9 to Guidelines § 3D1.2, which provides in relevant part:

A defendant may be convicted on conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature.

In short, Guidelines § 1B1.2(d) was enacted for sole purpose of clarifying then existing procedure, and therefore no ex post facto concerns can legitimately be raised.

Section 1B1.2(d)'s commentary suggesting that "the current instruction" in note 9 is "inadequate" is not to the contrary. In our view, the use of the term "inadequate" is entirely consistent with the idea that § 1B1.2(d) was meant merely to serve as a clarification of existing procedures. Nor is there any basis to Golden's assertion that note 9 is inapplicable where, as here, a defendant pleads guilty to only one conspiracy count. Such an interpretation would render meaningless all other Guideline provisions and commentary directing the sentencing court to consider the object offense, the number of acts the defendant conspired to commit, or the composite offense. We therefore hold that the district court properly enhanced Golden's sentence pursuant to Guidelines § 1B1.2(d).

*Enhancement for Role-in-the-Offense*

■ Finally, Golden challenges the district court's 2–unit upward adjustment for his role in the offense as an organizer. *See* Guidelines § 3B1.1(c). To support this argument, Golden maintains that district court committed reversible error in failing to distinguish his culpability from that of Lee McCorker, who he claims was the acknowledged motivating force behind both fires. This contention is meritless.

■ When reviewing the imposition of an adjustment under Guidelines § 3B1.1, we apply a clearly erroneous standard. *See United States v. Ruiz*, 932 F.2d 1174, 1183 (7th Cir.1991) (district court's finding that the defendant maintained control and supervision of other, pursuant to § 1B1.1, resolves a factual issue and will only be reversed for clear error); *United States v. Hernandez*, 931 F.2d 16, 17–18 (7th Cir. 1991) (determinations regarding the defendant's managerial role are factual and will be overturned only if clearly erroneous).

In light of the above principles, we cannot say that the district court erred by attributing the same degree of responsibility to Golden as to McCorker. Golden played an integral role as an organizer during both arsons. In the January 23, 1989 fire, Golden recruited the assistance of Tennessee. When that fire was unsuccessful, Golden organized a second attempt, this time with the help of both Tennessee and Walker. Following both fires, Golden received payment from McCorker, and in turn Golden distributed a small portion of the money to his accomplices. However, as the district court pointed out, Gold-

---

5. *See e.g.* Guidelines § 2X1.1 (providing that base offense level for a conspiracy is "for the object offense"); Guidelines § 1B1.3(a)(1) (providing that the sentencing court should determine the applicable guideline range, including adjustments in Chapter Three, on the basis of "all acts and omissions committed ... by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction....").

6. Specifically, Part D provides that "[s]ome offenses, e.g., racketeering and conspiracy, may be composite in that they involve a pattern of conduct or scheme involving multiple underlying offenses. *The rules in this Part are to be used to determine the offense level for such composite offenses from the offense level for the underlying offense*" (emphasis added).

en always kept the "lion's share of the proceeds for himself." This evidence clearly supports the district court's determination that Golden was an "organizer."

Contrary to Golden's assertion, the Guidelines' objective of proportionality, *see* Guidelines Ch. 1, Pt. A, § 3 (Policy Statement), does not preclude a finding that co-defendants can both qualify as organizers within the meaning of Guidelines § 3B1.1(c). *See United States v. Ramos,* 932 F.2d 611, 619 (7th Cir.1991) (more than one defendant can qualify as an organizer of a criminal offense). Oftentimes, criminal enterprises are directed by more than one leader, and these leaders may play differing supervisory roles. *See United States v. Backas,* 901 F.2d 1528, 1529–30 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990) (to be a supervisor, one need merely provide some form of direction or supervision to a subordinate in the original activity). Such is the case here.

Accordingly, we hold that the district court did not err in applying an upward role-in-the-offense adjustment under the circumstances of this case.

### III.

For the foregoing reasons, we AFFIRM the district court's sentence imposed on the defendant, Larry Golden.