**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael J. BADER, Defendant–
Appellant.**

**No. 90–3656.**

United States Court of Appeals,
Seventh Circuit.

Submitted Jan. 30, 1992.

Decided Feb. 12, 1992.

Andrew B. Baker, Jr., Ronald J. Kurpiers, Asst. U.S. Attys., Dyer, Ind., for plaintiff-appellee.

Alan M. Freedman, Freedman & Bornstein, Chicago, Ill., for defendant-appellant.

Before POSNER, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Michael Bader made four pipe bombs. One he used to test the design; it worked. Two more he taped to the front picture window of the Hall family's home, and the fourth to their back door. Bader lit the fuses and fled. The blast did $15,000 in damage to the structure. Shrapnel from the explosion passed within a foot of the head of a sleeping child. An investigation led to Darryl Rickert, who admitted that he asked Bader to damage the Halls' residence. Jeff Hall told Rickert's parents

that he believed their son was using drugs. Rickert decided to retaliate; Bader's bombs were the instruments of his revenge.

Bader pleaded guilty to maliciously damaging, by means of explosives, real property affecting interstate commerce. 18 U.S.C. § 844(i). See *United States v. Stillwell*, 900 F.2d 1104 (7th Cir.1990), holding that a building's use of natural gas from out of state establishes federal jurisdiction under § 844. His sole argument in this court is that the penalty exceeds the level appropriate under the sentencing guidelines. The district court sentenced Bader to 46 months' imprisonment, the mid-point of the range established by § 2K1.4 of the guidelines as they stood between November 1, 1989, and November 1, 1990. Bader damaged the Halls' home in January 1990 but was sentenced on November 9, 1990, after Amendment No. 330 had made some changes to § 2K1.4.

Congress instructed judges to apply the guidelines "that are in effect on the date the defendant is sentenced". 18 U.S.C. § 3553(a)(4). Some courts have held or implied that the ex post facto clause of the Constitution requires courts to use the guidelines that were in effect on the date of the crime. See *United States v. Suarez*, 911 F.2d 1016 (5th Cir.1990); *United States v. Swanger*, 919 F.2d 94 (8th Cir.1990); *United States v. Lam Kwong-Wah*, 924 F.2d 298, 304 (D.C.Cir.1991). To the extent these courts explain their conclusions—the opinions are brief, and some do not appear to recognize that they entail holding a statute unconstitutional—they equate a change in the guidelines with an increase in the punishment prescribed by law. *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), shows that sentencing guidelines may be "laws" for purposes of the ex post facto clause. Still, it remains to determine how the laws have changed, and whether the particular change exceeds the constitutional constraint. The amendments in *Miller* altered the classification of an offense, with substantial effects on the legal range of sanctions. The federal sentencing guidelines do not reclassify substantive crimes but are based on statutory offense categories. Section 844(i) exposed Bader to 120 months' imprisonment before and after November 1, 1990. He could have received more than twice his 46-month sentence without constitutional difficulty had there never been any guidelines.

Although the guidelines influence the exercise of discretion within the statutory range, judges may depart at appropriate times. On this understanding, a change in the sentencing guidelines is no different from, say, the institution of a get-tough policy under which the prosecutor no longer accepts pleas to lesser offenses, or the appointment of a new judge who favors longer sentences, or a change in the guidelines for parole, see *Prater v. U.S. Parole Commission*, 802 F.2d 948 (7th Cir.1986) (in banc), or a decision by the President to cease commuting the sentences of a class of felons. All of these may increase the time a criminal spends in prison without transgressing the ban on ex post facto laws.

Because the United States has neither filed an appeal seeking an increase in Bader's sentence nor defended the sentence by invoking the amended text, we need not decide whether the district judge should have used the guideline in force at the time of sentencing. *United States v. Bradach*, 949 F.2d 1461, 1465 n. 5 (7th Cir.1991), does not resolve that question. Like some opinions in other circuits, the footnote in *Bradach* does not explain why a change in the guidelines offends the ex post facto clause when a change in the parole release guidelines does not (*Bradach* does not cite *Prater*), and is at all events dictum. Our panel addressed the effect of a change in the guidelines after the defendant's sentencing. Because Congress has not authorized courts to apply amendments adopted after sentencing, *Bradach* had no occasion to decide whether § 3553(a)(4) is consistent with the Constitution and indeed did not cite that statute. Cf. *United States v. Golden*, 954 F.2d 1413, 1417–18 (7th Cir. 1992), observing that changes in the guidelines are not all of a piece for purposes of the ex post facto clause.

The version of § 2K1.4 on the books during January 1990 established a base offense level of 6, increased by 14 levels if the defendant "recklessly endangered the safety of another", § 2K1.4(b)(2), or 18 if the defendant "knowingly created a substantial risk of death or serious bodily injury", § 2K1.4(b)(1). Bader concedes that he recklessly endangered the Halls' safety but denies that he "knowingly created a substantial risk" of serious injury. The four points mean the difference between the presumptive range of 41–51 months that the district judge used and the 27–33 months that Bader believes appropriate.

At the outset of the sentencing hearing the district judge thrice remarked that the 18–point increase would be appropriate if the evidence should establish that Bader "knew or should have known that somebody was in there." When Bader's lawyer objected that disregarding what he "should have known" was at best reckless, the judge replied: "Not only knowledge, it's knowledge or what he should have known or could have concluded."

Although the sentencing guidelines do not define "knowingly," we doubt that the Sentencing Commission equated "knowing" with "should have known" or "could have concluded." Knowledge in criminal law is *actual* consciousness. E.g., *Contract Courier Services, Inc. v. Research and Special Programs Administration*, 924 F.2d 112, 113–14 (7th Cir.1991); cf. *McGill v. Duckworth*, 944 F.2d 344, 347–48 (7th Cir.1991); *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985). "Should have known" is closer to negligence than to knowledge. Although there are interesting hybrids—suspicion plus taking steps to avoid acquiring additional information is a form of knowledge, see *United States v. Giovannetti*, 919 F.2d 1223 (7th Cir.1990); *United States v. Ramsey*, 785 F.2d 184 (7th Cir.1986)—the district judge did not imply that this was what he meant by "should have known." "Knowledge" is a cousin to "purpose"; both concepts exclude "should have known but didn't." See *Model Penal Code* § 2.02 (1985). See also, e.g., *United States v. United States Gypsum Co.*, 438 U.S. 422, 444–45, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978). Nothing in the guidelines implies that the Commission used "knowingly" in a special sense; we conclude, then, that it has the usual meaning. What the defendant should have known is not knowledge.

Bader gains nothing by this conclusion, however. After listening to testimony covering more than 150 pages of transcript, the district judge concluded that Bader knew that the Halls were at home when he set off the bombs. One who detonates three bombs at a place he knows is occupied "knowingly create[s] a substantial risk of death or serious bodily injury". Bader does not contend that he thought the pipe bombs in the same class as firecrackers; although he now says that the explosions were more powerful than he had planned, matters of degree are of little moment when the question is whether the activity created a "substantial risk" to the occupants. One risk when setting off bombs is that the explosions will be bigger, or the shrapnel fly farther, than foreseen.

Bader stands condemned from his own mouth. Federal agents gave Rickert a transmitter and sent him to meet Bader in a bar. Here is part of their conversation:

Bader: I was just worried about, I was just worried about the fucking people.

Rickert: Well, you put 'em [downstairs] where you thought nobody would fucking be.

Bader: Yeah. But I thought the top one would go off first and there's no way, no way they could wake up and get downstairs. Bottom went off; about a minute later the top ones went off, so that gave him time time to get up and get out of that living room.

Rickert: What, the one in back went off?

Bader: Yeah, man, the one in back went off first about 40 seconds and about a minute, the other two went off. They went "Boom" "Boom" real quick and I'm like Whoa! I'm thinking man they had time to get up, walk out into that living room.

Rickert: Good thing nobody got hurt.

Bader: Ah, if they did, they did (laugh) .. that's all I can say! (laugh) .. shit happens.

Bader insists that Rickert told him that the Halls would be out of town the night of the bombing and that the conversation in the bar was designed to calm Rickert, who was upset by the force of the explosion. How such a conversation would mollify anyone is beyond us, but no matter. The district judge could believe (and found) that Bader was telling the truth to the hidden microphone. Bader then knew that his conduct created a "substantial risk of death or serious bodily injury".

AFFIRMED.