**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John G. FOUTRIS, Defendant–Appellant.**

**No. 91–2124.**

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1992.

Decided July 8, 1992.

Rehearing Denied Aug. 20, 1992.

Brenda Atkinson, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Div. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Robert A. Novelle (argued) and Philip M. Angelini, Serpico, Novelle & Navigato, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and NOLAND, Senior District Judge.[1]

BAUER, Chief Judge.

John Foutris pleaded guilty to offering an undercover Alcohol, Tobacco, and Firearms Agent $600.00 to burn down his tavern, in violation of 18 U.S.C. § 373. At sentencing, the district court determined that Foutris recklessly endangered the lives of others, and pursuant to Sentencing Guideline 2K1.4(b)(2), increased his base offense level by 14 levels. Foutris appeals this increase; we affirm.

## I.  Facts

Foutris operated the Six Pence Tavern in a rented storefront at 5947 N. Broadway Street, in Chicago, Illinois. The tavern was not profitable, and Foutris' partner absconded with $100,000 from another venture, leaving Foutris in financial straits. To escape his lease, Foutris offered one of his regular customers $1,000 to torch the tavern. Apparently the customer did not leap at the offer, and instead, introduced Foutris to Rich Marianos. Foutris believed Marianos was a professional arsonist, when in fact, Marianos is an agent with the Bureau of Alcohol, Tobacco, and Firearms.

During their taped meetings, Foutris told Marianos that he wanted the tavern destroyed. Marianos asked Foutris, "You want it burned completely to the ground[,] huh?" Foutris answered: "Well[,] not the whole thing, inside the bar only, I don't

1. The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation.

give a shit for the building, it's not my building.... I don't want to bother the building." Transcript of Monitored Conversation made 4/18/90, at 1. ("4/18/90 Transcript"). Foutris disabled his alarm, and provided Marianos with accelerants to start the fire. Foutris initially agreed to bring Marianos two or three bottles of gasoline to get the fire going, but ultimately decided that Marianos should use lighter fluid, paint thinner, and liquor from the bar. After the final details were worked out, Foutris was arrested.

The tavern is located in a storefront constructed of masonry and brick. A hardware store that stocks flammable liquids, such as paint, paint thinner, turpentine, and other accelerants, is located in the adjoining building. There is a beauty shop next to the hardware store, and five residential apartments over the shop. The apartments are 37.5 feet from the tavern.

The district court found that Foutris intended a limited fire that would destroy the merchandise and fixtures in his tavern, but not the building. Nevertheless, because Foutris took no precautions to ensure, or significantly influence, the containment of the fire, the district court concluded he recklessly endangered the lives of others. Regardless of Foutris' intent, the court found, he took no steps to ensure that the fire could be struck before it endangered passersby, firemen, and residents of the nearby apartments. The court found that Foutris "did not know with whom he was dealing in the planning of this offense, further demonstrating his recklessness as to outcome in spite of his admonition to his coconspirator to only do property damage and to limit the fire to the property inside the building." Transcript of Sentencing Hearing at 38. The court also stated that it could reasonably assume that an uncontrolled fire in a tavern "will expand and spread without regard to the intentions of its planner." *Id.* at 39. Based upon these findings, the district court held that Foutris recklessly endangered the lives of others, and increased his offense level pursuant to Guidelines § 2K1.4. Foutris received a 21–month sentence, with 36 months of supervised release.

## II. Analysis

The government bears the burden of proof on factors justifying an enhancement of a defendant's sentence. *United States v. Spillman,* 924 F.2d 721, 723 (7th Cir.1991). Whether an enhancement applies is a question of fact for the sentencing judge, which we review for clear error. *Id.* See also *United States v. Boyer,* 931 F.2d 1201, 1203–04 (7th Cir.1991); *United States v. Hubbard,* 929 F.2d 307, 310 (7th Cir.1991). We review sentencing determinations deferentially, and will affirm the sentence imposed unless we are left with a "definite and firm conviction that a mistake has been committed." *Boyer,* 931 F.2d at 1204. See also *United States v. McGuire,* 957 F.2d 310, 315 (7th Cir.1992); *United States v. Lewis,* 954 F.2d 1386, 1396 (7th Cir.1992).

The version of § 2K1.4 applied by the district court sets forth adjustments to the base offense level based upon specific offense characteristics, which must be determined with reasonable certainty. *See* Sentencing Guideline § 2X1.1. As the concurrence points out, this section was no longer in effect when Foutris was sentenced. Courts are to apply the Guidelines in effect at the time of sentencing unless the *ex post facto* clause is violated. *United States v. Bader,* 956 F.2d 708, 709 (7th Cir.1992). The amendment to § 2K1.4 did not affect Foutris' sentence in this case, however, so we shall ignore the error. *See infra* n. 2.

Section 2K1.4(b)(2) provided: "If the defendant recklessly endangered the safety of another, increase by 14 levels." Foutris argues that the 14-level increase is unwarranted in this case for three reasons: (1) the district court did not find that anyone was actually endangered because no fire was set; (2) Foutris specifically intended that no one be endangered by the fire; and (3) Foutris contemplated a small fire that would destroy only the inside of the tavern. The government contends that the court properly noted "the potential seriousness of the criminal plot that was entered into

by the defendant," and sentenced Foutris appropriately. *Sentencing Tr.* at 33.

The district court, Foutris, and the government rely heavily upon the First Circuit's analysis of § 2K1.4 in *United States v. Medeiros*, 897 F.2d 13 (1st Cir.1990). In *Medeiros*, the defendant acted as a middleman between an undercover agent and a professional arsonist. The agent told Medeiros that he wanted to burn down a 90-year–old, oil-soaked, wooden building located next to a residence. Medeiros explained to the undercover agent that the agent should stick around and watch the fire because it would be a "good show." *Id.* at 19. Taped conversations indicated that the defendant expected a spectacular blaze with flying debris.

The *Medeiros* court contrasted the contemplated fire in a commercial building located close to a residence, to a fire in an abandoned barn in the middle of a field. A major fire, located close to residential buildings, with concomitant rescue attempts, the court held, recklessly endangered others. The court recognized "that all fires present some danger to firefighters, and risks of a minor fire have presumably been factored into the base offense level. However, this is not a conspiracy involving 'malicious mischief,' i.e., minor property damage under circumstances that do not present an appreciable danger." *Id.* at 20 (quoting Sentencing Guidelines § 2K1.4, Commentary, Background).

The district court in this case, relying upon *Medeiros*, found the relevant inquiry when applying § 2K1.4 is

> whether there was sufficient evidence for the court to determine that the location of the building as described and depicted and the nature of the fire as planned would, with reasonable certainty, recklessly have endangered the occupants of the residence or the firefighters called upon to control the fire.

Sentencing Tr. at 33 (quoting *Medeiros*, 897 F.2d at 19). We have recently revisited this question in two cases. *United States v. Guadagno*, 970 F.2d 217 (7th Cir.1992); *United States v. Golden*, 954 F.2d 1413 (7th Cir.1992). In *Guadagno* and *Golden*, we refined the standards for reviewing determinations under § 2K1.4(b)(2). We held that the nature of the contemplated arson, and factors that might aggravate its seriousness are proper considerations under § 2K1.4.

Further, in *Golden*, we held that

> [i]n this day and age, the arson of an urban structure—whether residential or commercial—is virtually a per se reckless endangerment of others.... Even if a building is abandoned, there is always the chance that someone might be inside, or that a fire fighter may be injured or killed while putting out the flames. It is also common knowledge that fires which cannot be quickly contained will often spread to other structures and thereby amplify the risks of injury to additional civilians and fire fighters.

*Golden*, 954 F.2d at 1417. We did note in *Golden*, however, that an urban building that is isolated from other structures might not pose the same manifest danger to others, and, therefore, might not merit application of § 2K1.4(b)(2).

But in *Golden*, the defendants poured gasoline down a hole in the roof of a grocery store and tossed in Molotov cocktails. The store was located on the south side of Chicago in a residential neighborhood. We found the defendant's contentions that no one was actually injured, and that he was not aware anyone would be endangered by the fire, did not bar application of the 14-level enhancement. *Id.* at 1416–17.

Similarly in *Guadagno*, the defendant used two cans of gasoline and one can of kerosine to set fire to his grocery store. Although the store was several hundred feet from the nearest structure, and was, therefore, physically isolated, we concluded the district court properly applied § 2K1.4. Physical proximity to other structures is not the only way in which an urban fire can endanger lives. The defendant argued that he took precautions to prevent people from being injured by the fire—he blocked one entrance, made sure his employees had left the premises, and disabled a nearby pay telephone. Nevertheless, we found the

large scale fire that the defendant planned recklessly endangered firefighters and passersby, including a woman who tried to use the disabled phone just outside the store. The defendant used so much gas to start the blaze that the back wall of the building was blown off.

We find that *Golden* and *Guadagno* are dispositive here. Like the defendants in those cases, Foutris contends that because he did not specifically intend to harm anyone, and because no one was actually harmed, he cannot be found to have endangered lives recklessly. As we have stated, this contention is unavailing. "In this context, reckless endangerment requires proof that the defendant specifically intended to cause the type of fire that could endanger others, not that the defendant 'consciously sought to harm others.' " *Guadagno*, —— F.2d at 224 (quoting *United States v. Golden*, 954 F.2d at 1415–16).

Further, Foutris planned to start a fire using flammable liquids in a storefront on a busy Chicago Street. In the adjoining building, a hardware store, flammable liquids were stored. Next to the hardware store, 37.5 feet from the tavern, was a building containing five apartments. That the liquids in the hardware store were not immediately adjacent to the adjoining tavern wall does not remove the risk they posed to the severity of the fire. Further, Foutris disabled his alarm system so the arsonist could avoid discovery. This prevented any early warning of the hazard to passersby or occupants of the neighboring buildings. There is no evidence in the record that there was a sprinkler system on the premises which might extinguish a fire before it spread from the bar to the exterior structure.

Despite these facts, Foutris contends that because he did not intend to start a major or spectacular fire, like the one contemplated in *Medeiros*, he cannot be found to have endangered the lives of others recklessly. We disagree. Based upon the dictates of *Golden*, we find that the district court did not commit clear error in finding based upon these factors, particularly the use of accelerants and the close proximity of a residential structure, that Foutris recklessly endangered lives.

Moreover, we do not believe our rule that urban fires are almost per se reckless endangerment under the old § 2K1.4(b)(2) is unwarranted. At sentencing, a judge is not required to gather detailed technical information on the construction of the building or statistics on how often fires in such buildings spread. This trilogy of cases illustrates that district courts carefully consider the facts surrounding each arson, including the location of the building in relation to neighboring structures, the proximity of residential buildings, the type and size of fire contemplated by the arsonist, the way that the fire is started, precautions taken by the arsonist to avoid injuries, and factors that might contain or exacerbate the fire's spread. Clearly, district courts have not used the standard set forth in *Golden* to support snap judgments that unfairly impact sentencing.

We also question the concurrence's application of statistical data in this case. It concludes, based on arson figures provided by the National Fire Protection Association (and others), that each arson in 1990 resulted in only .0075 deaths (or, 7.75 deaths per 1000 arsons, where a difference of .00028 in the overall figure represents 26 lives per year). Based on this, and other facts, it seems to conclude that the risk of death in arson cases is quite low. But this reasoning is not entirely unproblematic. Another example illustrates the difficulty. There were 16,354,000 United States military personnel involved in World War II. Of these, 291,557 were killed in battle. Annual figures show that for every 1000 soldiers, 8.6 were killed in battle. Department of Commerce, 2 Historical Statistics of the United States, Series Y 856–903, at p. 1140 (1976). This means a member of the armed forces faced a .0086 chance of death in action. Based upon these calculations, then, we might conclude that military service during war-time is not particularly risky. But, the soldier getting bullets lobbed at his head, like the firefighter facing a burning building, might disagree.

Moreover, the Guidelines have been amended, and our interpretation of reckless endangerment seems to be of questionable significance for future cases anyway. *See* 1990 and 1991 Sentencing Guidelines § 2K1.4(a)(1)–(4).[2]

Foutris also argues that former § 2K1.4(b)(5), which applied "if the defendant endangered the safety of another person" is the more appropriate specific offense characteristic in these facts. The increase for simple endangerment is four levels, as opposed to the 14-level increase for reckless endangerment.

The Commentary to the arson guideline provides that where more than one specific offense characteristic applies, the sentencing court should use the greatest. § 2K1.4(b). We have found that the district court's determination that Foutris recklessly endangered the lives of others was not clearly erroneous. Because we find no clear error in the district court's findings, we refuse to alter its sentence and apply the lesser increase. As the court in *Medeiros* noted, "[i]t will always be the case that where reckless endangerment is found, simple endangerment even more clearly will appear." 897 F.2d at 20. This does not justify disturbing a trial judge's sentencing determination.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

**2.** The current version of § 2K1.4 provides:

(a) Base Offense Level (Apply the Greatest):
(1) 24, if the offense (A) created a substantial risk of death or serious bodily injury other than a participant in the offense, and that the risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling;
(2) 20, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction or attempted destruction of a structure other than a dwelling; or (C) endangered a dwelling, or a structure other than a dwelling;
(3) 2 plus the offense level from § 2F1.1 (Fraud and Deceit) if the offense was commit-

EASTERBROOK, Circuit Judge, concurring.

The sentencing guideline for arson through October 1990 established a base offense level of 6, increased by 14 levels if the defendant "recklessly endangered the safety of another", § 2K1.4(b)(2), or 18 if he "knowingly created a substantial risk of death or serious bodily injury", § 2K1.4(b)(1). "Reckless" is a slippery term, which the Sentencing Commission discarded when promulgating a new arson guideline effective November 1, 1990. See amendment 330. The replacement gives a base level of 20 if the offense "(A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction or attempted destruction of a structure other than a dwelling; or (C) endangered a dwelling, or a structure other than a dwelling". U.S.S.G. § 2K1.4(a)(2). The base offense level is 24 if the substantial risk is created "knowingly" or the arson involves the actual or attempted destruction of a dwelling. U.S.S.G. § 2K1.4(a)(1).

Under the current version of § 2K1.4(a)(2) this is an easy case. Foutris hired someone to torch a bar, which at a minimum "endangered ... a structure other than a dwelling". Foutris was sentenced in May 1991, and judges must use the guidelines "that are in effect on the date the defendant is sentenced". 18 U.S.C. § 3553(a)(4). Yet everyone, including the judge, believed that the old version of § 2K1.4 applies, and the brief for the

ted in connection with a scheme to defraud; or
(4) 2 plus the offense level from § 2B1.3 (Property Damage or Destruction).
The version of the Guidelines under which Foutris was sentenced provided a 14-level increase in a defendant's base offense level if he recklessly endangered the lives of others. This corresponds to the current base offense level of 20 for such conduct (base offense level 6 plus 14 levels). Thus, the new guideline provides the same level of punishment, but defines more precisely the requirements of each offense level.
We also note that the Application Notes provide that substantial risk of death or injury includes risk to firefighters and emergency personnel who respond to the fire. *Id.*

United States asserts that "[t]he guideline in effect at the time of the defendant's sentencing contained a base offense level of 6". Did no one read the guidelines carefully? Although some changes in the guidelines after the date of the crime may create problems under the ex post facto clause, the change in § 2K1.4 does not, see *United States v. Bader*, 956 F.2d 708 (7th Cir.1992), if only because the current version, with a base level of 20, comes to the same thing as the former version with a base of 6 plus 14 for recklessness, given our conclusion that "[i]n this day and age, the arson of an urban structure—whether residential or commercial—is virtually a per se reckless endangerment of others." *United States v. Golden*, 954 F.2d 1413, 1417 (7th Cir.1992).

Under the former version of § 2K1.4 this is anything but an easy case, if *Golden* be put aside. It illustrates the obstacles to uniform, predictable sentences under the guidelines. Many provisions of the guidelines present knotty but tractable issues. Did the defendant act "knowingly"? "Intentionally"? Did the defendant possess more than a kilogram of cocaine? How about his partners in crime? Former § 2K1.4(b)(2) uses familiar terms such as "recklessly" but presents a different kind of question altogether, and a more difficult one. Just how dangerous *is* arson in general, or in the case at hand? To answer such questions judges must either hear from experts or turn to data about arson, and then make adjustments that depend on technical issues such as how fires transmit heat. Although judges are comfortable consulting their intuition, facts are the proper guide to scientific and technical matters. "Common sense" told people that the Earth is the center of the universe and that the four elements are earth, air, fire, and water. When the United States declared its independence, no one in the world knew that oxygen had anything to do with fire (the prime suspect was "phlogiston"). Introspection is a poor source of "information" when liberty hangs in the balance; judicial guesstimates also defeat the purpose of the guidelines in producing uniform sentences, for one judge's untutored private views about arson are unlikely to match another's. Cf. *Brewer v. Aiken*, 935 F.2d 850, 861–62 (7th Cir.1991) (concurring opinion).

How dangerous is arson of a building known to be unoccupied? The record contains no evidence, and the lawyers have presented their diametrically opposed, but equally ignorant, views on that subject. According to the National Fire Protection Association, the facts for arsons of buildings are:

| Year | Fires | Civilian Deaths |
| --- | --- | --- |
| 1987 | 105,000 | 730 |
| 1988 | 99,500 | 740 |
| 1989 | 97,000 | 615 |
| 1990 | 97,000 | 715 |

These figures exceed those in the *Uniform Crime Reports*, which lists only 46,-216 structural arsons in 1990, *Crime in the United States* 43 (1991), because the FBI counts only blazes known to be arson, while the NFPA includes fires of suspicious origin. But the difference does not matter for current purposes. About 100 firefighters perish on the job annually. One hundred two died in 1990, only 44 of these at the scene of a fire. Arthur E. Washburn, Paul R. LeBlanc & Rita F. Fahy, *Fire Fighter Fatalities 1990*, in NFPA Journal (July/Aug.1991). "Sixteen fire fighters ... died as a result of incendiary and suspicious fires—4 while responding to or returning from such fires, 9 at structure fires, and 2 at wildland fires." *Id.* at 12.

Adding 14 firefighters' deaths (excluding the two wildland fires) to the NFPA's data on civilian deaths implies that each arson led to 0.0075 deaths in 1990. That number overstates risks for arsons such as Foutris's, however, because it includes deaths from fires set in buildings occupied at the time. Eighty-seven of the 715 deaths in 1990 occurred in the blaze at the Happy Land social club in New York. Such deaths must be subtracted to get a handle on the hazards of arsons at empty buildings. For the dangers in an unoccupied building are of a different kind: risks to firefighters trying to extinguish the flames and risks to adjacent buildings that may be populated. Despite what we assumed in

*Golden,* even in urban areas fire rarely affects adjacent buildings. A study by the Dallas Fire Department reveals that of the 530 fires in that city in early 1979, only 9 spread beyond the original structure. *Measuring Fire Spread* 9 (U.S. Department of Commerce, National Technical Information Service 1979).

No data I could locate show how many of the deaths could be traced to fires started in unoccupied buildings. The NFPA has a database from which an expert could extract that information, but it is not published. A safe estimate is that the hazard is at least an order of magnitude less for arson in an unoccupied building, so that such a fire is associated with fewer than 0.001 deaths and about five times that many injuries. (The ratio of fire injuries to fire deaths has been stable at five for many years. See *1991 Statistical Abstract of the United States* Table 346.)

Aggregate data do not conclude the judicial task, for fires differ in their propensity to spread. Wooden buildings burn much more readily than masonry ones, and because structural fires spread more by radiated heat than by embers, the size and location of openings in the walls are important. See, e.g., F.R. Steward, *Basic Principles of Radiative Transfer,* in *Heat Transfer in Fires* 277 (Perry L. Blackshear ed. 1974); Daniel Gross, *Data Sources for Parameters Used in Predictive Modeling of Fire Growth and Smoke Spread* (U.S. Department of Commerce, National Bureau of Standards, Center for Fire Research 1985).

Foutris planned a fire in a one-story bar with double masonry walls. The only adjacent building, a one-story hardware store, was of similar construction. Radiative heat transfer would have been low, making it less likely than the norm that the fire would spread—if indeed a fire set the way Foutris wanted, with the alcohol in whiskey and vodka as the principal accelerant, had much chance of doing significant damage even to the bar. The residence closest to the bar was on the other side of the hardware store, and by the time a fire could engulf the hardware store and leap to the apartments, these persons would have been alerted. So the risk in Foutris's plans was less than the norm of one death per 1,000 fires in unoccupied buildings. Because an act is reckless in the sense of criminal law when it reflects indifference to a substantial risk—see *Model Penal Code* § 2.02(2)(c) (1985), providing that one who "consciously disregards a substantial and unjustifiable risk" acts recklessly—it is hard to say that acts creating hazards one time in a thousand are "reckless" for purposes of the sentencing guidelines unless we take the view that all dangerous acts that lack social benefits are "reckless." In that event, however, there would be no reason to treat "recklessness" as an aggravating factor in the criminal law, for arson is itself an unjustifiable and dangerous act. So the Sentencing Commission came to realize when it eliminated recklessness as a separate factor in sentencing.

Because the parties have argued this case to us under superseded guidelines, it makes little difference how we resolve their dispute. Neither side presented facts, and in a world of speculation the district judge's guess is as good as any. On the authority of *Golden,* I concur in the judgment affirming the sentence. In litigation under the guidelines, however, lawyers' hot air is no substitute for facts.