**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph MARTINEZ, Paul Mahn, and Garth Cohen, Defendants–Appellants.**

**Nos. 92–3738, 92–3739 and 92–3776.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1994.

Decided Feb. 9, 1994.

Mark S. Prosperi (argued), Terry M. Kinney, Crim. Div. and Barry R. Elden, Crim. Receiving, Appellate Div., Asst. U.S. Attys., Office of the U.S. Atty., Chicago, IL, for plaintiff-appellee.

Carol A. Brook, Nancy B. Murnighan (argued), Office of the Federal Defender Program, Howard B. Levy (argued) and David Rubman, Chicago, IL, for defendants-appellants.

Before POSNER, Chief Judge, and FAIRCHILD and FLAUM, Circuit Judges.

POSNER, Chief Judge.

It is a Wednesday evening in April. A car is proceeding east on Division, a major thoroughfare in downtown Chicago. As it reaches the corner of Dearborn (the avenue on which this courthouse is located a few miles south of the intersection with Division), the car is rocked by an explosion from within, and stops. The force of the explosion jams the doors and blows out the windows. Two men clamber through the empty window frames. One, the driver, his hair on fire, staggers off, refuses bystanders' offers of assistance, leaps into a cab, vanishes. He is Paul Mahn, one of the defendants in this case; he takes the cab to a rendezvous with two other defendants. The other man, the passenger, staggers to the curb and collapses, a gaping wound in his chest. He dies. He was Donald Mares, and the main issue presented by these consolidated appeals is the significance of his death to the sentences imposed on the appellants.

Jay Brissette, a defendant but not an appellant, owned a flooring business in California. Mahn worked for him. Accompanied by Mahn and Mares, Brissette traveled to Phoenix in December 1991 to destroy video machines in a pornographic bookstore whose owner had refused to pay protection money. Brissette and his companions smashed the machines with sledgehammers and returned to California. His principals then paid him $60,000 to recruit a team for similar assignments in Chicago. He decided that the chances of apprehension would be lessened if the bookstores were bombed, as it would then be unnecessary to break into them. Mares would design and build the bombs. The three men tested some bombs in a desert area in California. They were joined at the test site by defendant Garth Cohen, an army veteran who brought along some artillery detonators. The fourth defendant, Joseph Martinez, was an acquaintance of Brissette who wanted to go along on the Chicago jobs, but Brissette told him that he had enough men. Then Cohen backed out and was replaced by Martinez, but agreed to drive the other men to the Los Angeles airport and pick them up on their return; he was to be paid $50 for each trip.

Brissette, Mares, Mahn, and Martinez flew to Milwaukee, rented a car, and drove to Chicago. They had eight pornographic bookstores to bomb but decided to spare two because they were in bad neighborhoods (!). Mares built six bombs. They were pipe bombs that, after being activated, could be detonated by the remote-control electronic devices that are used to control toy cars. Brissette rented a second car, and the group split up into two teams. Mahn was to drive Mares, who would place five bombs at five stores. Brissette was to drive Martinez, who would place the remaining bomb; originally Martinez had agreed to place two bombs, but he got cold feet and refused to place more than one.

Martinez's target was next to a muffler shop. Just as he was about to place the bomb he lost his nerve, and while he was leaving the bookstore placed the bomb against the back wall of the muffler shop; he thought the wall could withstand the blast better than the bookstore. He did not detonate the bomb; it detonated later on its own and gouged a hole in the ground two feet deep and a foot across. Martinez rejoined Brissette and they drove to the rendezvous.

Mares had placed one of his bombs (which did not explode, and was later disarmed safely), and he and Mahn were nearing their second destination, when the explosion occurred. Mares had just taken another bomb out of his bomb bag and placed it on his lap.

He was bending over it when it went off. Probably he had armed it and it went off when an electrical signal, perhaps from a car phone in a nearby car, detonated it. But this is conjecture.

The three survivors drove back to Milwaukee and then flew back to Los Angeles, being picked up by Cohen as arranged. The four of them were arrested shortly afterward, were brought back to Chicago, were charged, and pleaded guilty to attempting to destroy buildings by means of explosives and to interstate travel in aid of racketeering. 18 U.S.C. §§ 844(i), 1952. Yet the judge sentenced them under the federal sentencing guideline applicable to second-degree murder. Brissette, the ringleader, got nine years; Mahn, less culpable but with a much longer criminal record, ten years and one month; Martinez eight years and one month; Cohen a mere three years and five months. The judge proceeded in this fashion because of Mares's death. The appellants argue that because he was a participant in their crimes they should not be punished as if they had been guilty of felony murder.

The judge began her sentencing analysis with Sentencing Guideline § 2K1.4, which is the guideline for arson and for—what is really a subcategory of arson—property damage by means of explosives. This guideline specifies a base offense level of 24 if the offense "created a substantial risk of death or serious bodily injury to any person *other than a participant in the offense.*" U.S.S.G. § 2K1.4(a)(1) (emphasis added). The defendants would have gotten lighter sentences had they been sentenced under this provision, as they argue they should have been; they do not deny that their offense posed a substantial risk of death or serious bodily injury to nonparticipants, though no one besides Mares and Mahn was injured. Instead, however, the judge skipped to subsection (c) of section 2K1.4, which provides that "if death resulted . . . apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." The judge decided that the most analogous guideline from Chapter Two, Part A was section 2A1.1: first-degree murder.

For among the statutory provisions to which the commentary to this section refers is 18 U.S.C. § 1111, the federal murder statute; and among the offenses comprehended by that statute are "murder . . . committed in the perpetration of, or attempt to perpetrate, any arson." Application Note 1 to U.S.S.G. § 2A1.1 authorizes a downward departure— but not below the offense level specified in section 2A1.2, second-degree murder—"if the defendant did not cause the death intentionally or knowingly." The judge made this departure, and the base offense level for second-degree murder (33, versus 24 for arson), after various adjustments, generated the sentences she imposed.

■ The appellants argue that it was by inadvertence that the Sentencing Commission omitted from the cross-reference section in the arson guideline, after "death," the words "other than [of] a participant in the offense." If danger to a participant is deemed irrelevant in sentencing when the danger does not materialize, why should it be deemed relevant when the danger does materialize? The reason it is deemed irrelevant if no participant is actually hurt is that arson is believed to be inherently dangerous to the arsonist. The belief is especially plausible when explosives are employed; cases in which bombers blow themselves up are legion. An inherent as distinguished from a contingent characteristic of an offense cannot be used to pick out an aggravated version of the offense. *United States v. Lallemand,* 989 F.2d 936, 939–40 (7th Cir.1993); *United States v. Doubet,* 969 F.2d 341, 346–47 (7th Cir.1992); *Thomas v. Brennan,* 961 F.2d 612, 619–20 (7th Cir.1992). Endangerment of others, that is of nonparticipants in the arson, is (perhaps surprisingly—but see *United States v. Foutris,* 966 F.2d 1158, 1164–65 (7th Cir.1992) (concurring opinion)) not considered inherent in arson; if it is present, it jacks up the base offense level from 6 to 24. U.S.S.G. §§ 2B1.3, 2K1.4(a)(4).

■ But the fact that endangering a participant is not an aggravating circumstance for arson does not erase the difference in culpability between endangerment and death. It is true that in a system of morality in which only intentions and behaviors, but not

consequences, count, there is no moral distinction between dangerous conduct that causes harm and otherwise identical dangerous conduct that does not. The only difference is luck, not usually considered a moral attribute. But "moral luck," as philosophers refer to distinctions in culpability that are based on consequences rather than intentions, is, rightly or wrongly, a pervasive characteristic of moral thought in our society, at least the moral thought that informs the criminal law. Two people drive at the same unlawful speed under identical road conditions. One hits a child; one hits no one. The first is guilty of involuntary manslaughter; the second of a violation of the highway code. The only difference between their conduct is the consequence. The difference, though fortuitous, counts for the severity of the punishment deemed appropriate for the defendants' behavior.

So there is no anomaly in the fact that the appellants in this case received heavier punishments "merely" because of the accident that Mares blew himself up with one of his bombs. The greater anomaly would be if his death had not affected their punishment in the slightest. Not everyone would agree. Hamlet thought it poetic justice that a bomber should be blown up by his own bomb—hoist by his own petard ("petard" means bomb). We have to decide whether the draftsmen of the federal sentencing guidelines took Hamlet's position. The text of the guideline suggests not, but if we must look further the best evidence of the draftsmen's intentions would seem to be the federal law of felony murder. If the death of a participant in the course of a felony is felony murder under federal law, it would be anomalous to treat such a death as irrelevant in sentencing for arson; and then the cross-reference should indeed be read literally and the words "other than a participant in the offense" not interpolated. It is true that these defendants were not and could not have been convicted, not by a federal court at any rate, of felony murder, because the felony murder of Mares did not take place "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. §§ 7, 1111(b). But in particular instances illustrated by the cross-reference in the arson guideline, the

sentencing guidelines require that people be sentenced as if they had been convicted of a different crime (in this case, murder) from the one for which they were convicted, provided, as we shall see, that the former occurred during the commission (or preparation, or aftermath) of the latter.

Unfortunately, there is a remarkable dearth of cases on whether the federal murder statute is applicable to felony murders in which the person killed was a participant in the felony. We can find only one case in which the question was squarely addressed, *United States v. El–Zoubi*, 993 F.2d 442, 449 (5th Cir.1993), and it holds that the statute is applicable, though there is a contrary dictum in *United States v. Schwanke*, 598 F.2d 575, 579 (10th Cir.1979), of which more later. The same question has arisen under state murder statutes, and the same answer has been given as in *El–Zoubi*. *State v. Hoang*, 243 Kan. 40, 755 P.2d 7 (1988); *Mikenas v. State*, 367 So.2d 606 (Fla.1978) (per curiam); *Scott v. State*, 252 Ga. 251, 313 S.E.2d 87 (1984); *In re Leon*, 122 R.I. 548, 410 A.2d 121, 125 (1980); *Taylor v. Superior Court*, 3 Cal.3d 578, 91 Cal.Rptr. 275, 477 P.2d 131 (1970); *State v. Morran*, 131 Mont. 17, 306 P.2d 679, 688–89 (1957); *Commonwealth v. Bolish*, 381 Pa. 500, 113 A.2d 464, 470–75 (1955), overruled on other grounds by *Commonwealth ex rel. Shadd v. Myers*, 423 Pa. 82, 223 A.2d 296 (1966); *State v. Sotteriou*, 132 N.J.Super. 403, 334 A.2d 47, 50 (1975) (per curiam). Several states, however, distinguish between the case in which the accidental death of the felon is self-inflicted and the case in which he is killed by a cofelon, reasoning that the first case does not involve a homicide at all and so cannot be the basis of a charge of felony murder. *State v. Perez*, 382 So.2d 731 (Fla.App.1980) (per curiam); *People v. Antick*, 15 Cal.3d 79, 123 Cal.Rptr. 475, 482–83, 539 P.2d 43, 50–51 (1975); *People v. La Barbera*, 159 Misc. 177, 287 N.Y.S. 257, 262 (S.Ct.1936). (We have found no federal cases that address this issue.) This is a logical distinction, but we cannot fathom the sense of it. Whether the felon is felled by himself or by a cofelon, a felon dies by accident (unlike *State ex rel. Painter v. Zakaib*, 186 W.Va. 82, 411 S.E.2d 25 (1991),

where one of the felons killed himself deliberately); here it could as easily have been Mahn as Mares; and in many bombing cases it will be unclear who triggered the bomb. *Scott v. State, supra,* 313 S.E.2d at 88. A more apt analogy for accidental self-killing in the felony murder setting than suicide is transferred intent in tort law: if A shoots C intending to shoot B, A is liable to C for battery, just as if he had intended to hurt C.

The better rule, hence the one we would hope to see adopted in cases under the federal felony murder statute, is that the death of a felon, whether by his own hand or that of another felon, in the course of any of the felonies (including arson) listed in the statute, is a felony murder. The lives of criminals are not completely worthless, so their deaths should not be considered non-events for sentencing purposes; and lest that seem an amorphous and even mawkish ground for an expansive interpretation of felony murder, we add that liability for felony murder in a case such as the present serves the practical function of deterring felons from using lethal weaponry, more broadly from committing the kind of felony in which someone is likely to be shot or run down or otherwise injured (and hence possibly killed), by punishing them severely should death result—to anyone. Cases that refuse to apply the felony-murder rule when the death is caused by someone outside the criminal enterprise, typically a victim or a police officer, do so on the mechanical ground that the acts of these outsiders cannot be attributed to the criminals by the principles of the law of agency. E.g., *State v. Bonner,* 330 N.C. 536, 411 S.E.2d 598, 601 (1992). Those cases lose sight of the deterrent function of the doctrine (on which see Kevin Cole, "Killings During Crime: Toward a Discriminating Theory of Strict Liability," 28 *Am. Crim.L.Rev.* 73, 87–120 (1990)), a function grounded in criminal law rather than agency law. The doctrine creates marginal deterrence of dangerous felonies even when the principal danger is to the felons themselves. One who commits a crime of violence is more likely to be shot by a victim or a police officer than one who commits a nonviolent crime. Even within the class of violent felonies, a felon is more likely to be shot by a

victim or a police officer if he is armed—and if he is not shot but his cofelon is, he stands to receive a heavier punishment. If we must have felons, at least let them be peaceable felons.

The sentences imposed in this case are not unduly harsh when we consider the nature of the defendants' conduct—not to mention the sentences meted out these days to relatively minor drug offenders. Carrying lethal and, judging from what happened to Mares, unstable bombs through the streets of Chicago at rush hour with the intention of blowing up downtown stores, however disreputable, as part of a nationwide scheme of extortion deserves punishment of exemplary severity. The death of Mares confirmed the dangerousness of the defendants' conduct, and the sentences imposed as a consequence of that death may encourage future extortionists to stay with sledgehammers rather than graduating to explosives.

Although the defendants were sentenced as if under the federal murder statute, we cannot disregard the fact that they were convicted under the arson statute instead. And while it is true that the latter statute authorizes an enhanced penalty—up to life imprisonment or even death, just as if the defendant had been charged with felony murder—if a person is killed in the course of the arson, 18 U.S.C. § 844(i), the only case to construe this provision holds that it does not apply if the person killed is a cofelon. *United States v. Schwanke, supra.* In fact the statute was a little less clear on this point when *Schwanke* was decided, yet there is a hint in *United States v. Bos,* 917 F.2d 1178, 1182 (9th Cir.1990), that the same result would be reached under the amended statute. We need not opine on the scope or soundness of *Schwanke.* The appellants, while citing that decision in support of their preferred interpretation of the cross-reference in the arson guideline, do not argue that to sentence them for arson under the guideline applicable to felony murder would be improper because it violated a limitation in the arson statute—a limitation of enhancement to cases in which someone other than a felon is killed in the course of the arson.

The appellants make a different argument with respect to their having been sentenced as if for felony murder rather than arson. The object of the guidelines' "real offense" provisions, such as the cross-reference in the arson statute, is to punish defendants for all acts and omissions committed, aided, counseled, caused, etc. during the preparation, commission, or aftermath of the crimes for which the defendants were convicted. U.S.S.G. § 1B1.3(a)(1)(A). But the next subsection of the "relevant conduct" guideline, § 1B1.3(a)(1)(B), when read in conjunction with Application Note 2 to section 1B1.3, appears to confine subsection (A) to acts that the defendant himself did or caused to be done. Liability for acts done by a cofelon, such as Mares's act in killing himself, is governed by subsection (B), which provides that "in the case of a jointly undertaken criminal activity," the actors shall be liable for, but only for, the "reasonably foreseeable acts and omissions of others *in furtherance of*" the activity (emphasis added). The appellants concede that Mares's death was foreseeable. But it was not, they argue, in furtherance of the criminal activity—in fact it thwarted it. The application of felony murder principles does not require, however, a finding that the death was in furtherance of the felony, but only that the act that *caused* the death was in furtherance of the felony. *State v. Arias*, 131 Ariz. 441, 641 P.2d 1285, 1287 (1982). If a rapist strangles his victim accidentally in the course of the rape, it is felony murder even though he was not trying to kill her; indeed if he were trying to kill her, there would be no need to invoke the concept of felony murder in order to convict him of murder. The fact that felony murder is often found in situations of accidental death shows that the appellants cannot be right in arguing that death must be itself a part of the plan. The act that caused Mares's death—carrying an armed bomb in a vehicle traversing an area dense with electromagnetic signals that could trigger the bomb at any moment—was in furtherance of the criminal scheme.

And all this assumes that the requirement that the act be in "furtherance" of the felony relates to the character of the act rather than to the scope of the felonious undertaking. Yet under both substantive criminal law, *United States v. Heinlein*, 490 F.2d 725, 736–37 (D.C.Cir.1973); *State v. Gomez*, 225 Conn. 347, 622 A.2d 1014, 1017 (1993), and the sentencing guidelines, see U.S.S.G. § 1B1.3, Application Note 2(c); cf. *United States v. Lilly*, 13 F.3d 15, 17–18 (1st Cir.1994); *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993); *United States v. Gilliam*, 987 F.2d 1009, 1012–13 (4th Cir. 1993); *United States v. Olderbak*, 961 F.2d 756, 764 (8th Cir.1992), the function of the requirement is to confine liability for felony murder to deaths that occur during the course of the felony. If your confederate, with whom you had agreed to rob one store, robs a second store and someone dies in the course of that robbery, you are not guilty of felony murder even if the second robbery was foreseeable.

It remains to consider defendant Mahn's complaint that he should not have been sentenced more severely than the other defendants. Brissette received a slightly lighter sentence because he had a shorter criminal record. Martinez received a significantly lighter sentence than Mahn because he joined the bombing scheme later—remember that Mahn had gone with Brissette and Mares to Phoenix—and because he limited his participation to one bomb and tried in placing it to minimize the damage that it would cause. Cohen received a much lighter sentence than either of the others because he largely although not entirely withdrew from the scheme before the bombings took place, and, as with the sentence reduction for Martinez, we want to encourage criminals to develop cold feet. These sentencing differences were consistent with the guidelines and were adequately although not amply explained by the district judge during the sentencing hearing. The other grounds of appeal (for example, that Mahn was a minimal participant in the offense) are insubstantial and do not require discussion.

AFFIRMED.